JOHN G. PRIEST, Appellant v. JOHN LAWRENCE,
Respondent.

### February 10, 1885.

1. DE FACTO OFFICERS — SCHEME AND CHARTER — RECORDER OF DEEDS. —
During the interval between the election which resulted in the separation
of the county from the city of St. Louis and the judicial ascertainment
and official promulgation of that result, the recorder of deeds for St.
Louis County remained the *de jure* recorder for both the city and the
county.

2. JUDICIAL NOTICE. — Appellate courts will take judicial notice of the his-
torical facts as to the dates when and the circumstances under which a
constitutional change in a county government occurs.

APPEAL from the St. Louis County Court, EDWARDS, J.
*Reversed and remanded with directions.*

W. F. BROADHEAD & W. H. CLOPTON, for the appellant:
Recording being the act of an officer of the law — not of the
person presenting the instrument for record — and the
recorder for St. Louis city and county being the *de facto*
recorder for all the county until the official promulgation of
the result of the election, his recording the deed in the city
was the act of a *de facto* officer, of which the world must
take notice and by which all persons are bound. — *The State*
v. *Douglass*, 50 Mo. 593; *Ex parte Snyder*, 64 Mo. 58;
*The State* v. *Seay*, 64 Mo. 89; *Wickersham* v. *Woodbeck*,
57 Mo. 59; *The City* v. *Stoddard*, 15 Mo. App. 473.

JOHN JOHNSON, for the respondent: The deed not having
been recorded in the territorial subdivision of the state in
which the land lay, did not impart constructive notice. —
*Muldrow* v. *Robison*, 58 Mo. 331; *Davis* v. *Ownby*, 14
Mo. 170; *Terrell et al.* v. *Andrew County*, 44 Mo. 309;
Rev. Stats., sects. 691, 692, 693.

LEWIS, P. J., delivered the opinion of the court.
This is an action of ejectment for a parcel of land situated
in the county of St. Louis. Both parties claim under a
common source of title from Ringrose J. Watson.

Plaintiff exhibits in evidence a deed to himself from Ringrose J. Watson, dated November 20, 1875, and recorded in the recorder's office in the city of St. Louis on December 18, 1876.   Defendant relies upon a deed from the coroner of St. Louis county, dated August 30, 1880, conveying the land to Henry R. Watson under an execution sale upon a judgment against Ringrose J. Watson, rendered by a justice of the peace, on October 9, 1876, of which a transcript was filed in the clerk's office of the circuit court, city of St. Louis, on October 25, 1876.   This judgment was revived in the same circuit court on December 13, 1880.   The court below held in this case that the recording of the plaintiff's deed imparted no notice as against the defendant's claim of title, because the scheme of separation had then gone into effect, and the land lay without the boundaries of the city in which the recording was done.   The judgment was for the defendant.

In pursuance of constitutional provisions, the scheme and charter were submitted to the popular vote on August 22, 1876.   It was officially announced by the clerk of the county court that the election had resulted in a defeat of those measures.   This result was generally acquiesced in, and the old order of things continued without interruption until the month of December next following.   By the terms of the constitution, the scheme and charter, if adopted, were to go into effect at the expiration of sixty days after the election, and there was to be an official promulgation of the fact, signed by the mayor of the city and the presiding justice of the county court.   A new presiding justice, Charles Speck, was elected in November, under the old law, and qualified in due form.   About this time sundry judicial proceedings were instituted with a view to testing the true results of the election held in August, and these inquiries terminated in a reversal of the clerk's announcement, so that, on December 29, 1876, the mayor of the city and the then acting presiding justice of the county

court, Charles Speck, issued their official promulgation, in due form, declaring that the scheme and charter had been fully ratified by the popular vote. These are matters of public history whereof we must take judicial notice. It should be added that no county officers for the separated county were elected or appointed until after the 29th of December, 1876.

According to the theory of the circuit court, the territory which, until sixty days after the election held in August, 1876, had constituted the county of St. Louis, became at the expiration of that period, both in fact and in law, two distinct and several municipal subdivisions of the state; so that the recording of a deed in one of them for land wholly situate within the other, imparted no notice of the contents, and was equivalent to no recording at all. If this proposition is correct, a like ruling must be applied to all acts which the law required to be done by a county officer within the county. During the interval between the legal separation and the appointment of officers for the separated county, no citizen could sue or be sued before a court of record within that subdivision, because there was neither court nor sheriff empowered to act therein. There could be no indictment found anywhere for crime committed within the same boundaries. No taxes could be paid; and if the tax-payer voluntarily paid them to the collector for the old county, his obligation would not be discharged. And an important functionary, whose seat of power was founded within the city, could not have listened to the prayer of such worthy citizens of the county as might have desired the licensing of a convenient dram-shop. Happily, our existing law did not admit of such an appalling *interregnum*.

Counsel for the plaintiff invokes, as applicable to his client's case, the *de facto* rule, one of the oldest and most firmly established in our jurisprudence. This is always enforced in favor of the citizen, who, in order to the enjoyment of

a legal right, is compelled, without any fault of his, to depend upon one whose assumed tenure as an officer, though not legal, is yet such as to bring him within the description of a *de facto* officer. The plaintiff had, in his option, an unquestionable right to the cumulative assurance of his title provided for in the registration laws. He could not avail himself of this right in the separated county, because neither a recorder, nor a recorder's office was yet to be found there.

But we do not think that, in the facts of this case, there was any need for the plaintiff to find in the officer with whom he filed his deed for record, a *de facto* recorder. The constitutional provisions which prepared the way for the introduction of the scheme and charter contain nothing which, by any sort of implication, can be supposed to have intended that the old local governmental machinery should cease to operate before an actual erection and organization of the new. Such a supposition would be in antagonism with the whole spirit of our institutions, which recognize the paramount necessity of an unintermittent government by law. The scheme itself was a law defining boundaries; but not establishing *ipso facto*, when it became a law, the several agencies of the state's sovereignty, by which this was to be represented on either side of the dividing line. That was to be accomplished later by means which the same law pointed out. The principle is illustrated in *The People* v. *Maguire* ( 32 Cal. 143 ), where the court said: " So far as defining its boundaries is concerned, the act itself forms the county ; but so far as its organization is concerned, it merely directs how it shall be accomplished. To constitute a county, something more is required than to define its boundaries. A local government must be provided, and the creation of the county is not accomplished until both these things have been done in the appointed mode." See also, *Mason* v. *Woerner* 18 Mo. 566. From these principles it results that, although at the time referred to the

scheme had become a law, yet the separated county had not then acquired a legal existence.

Article XIV., section 5, of our state constitution, declares : " In the absence of any contrary provision, all officers now or hereafter elected or appointed, subject to the right of resignation, shall hold office during their official terms, and until their successors shall be duly elected or appointed and qualified." It can hardly be an overstrained construction, to say that when, through changes effected by operation of law, the old recorder for the city and county became superseded, as to the county territory, by the new recorder for that territory ; the last recorder was, as to the same territory, the lawful successor of the first within the constitutional meaning. If a doubt shall linger over this view of the situation, it should be easily resolved by the constitutional solicitude manifest in that section, for a constant retention of existing governmental personal agencies, until their legal substitutes shall be quite ready for the official services due to the public. Every exaction to be found in the spirit, as well as the letter of the constitution, in this connection, requires us to hold that the recorder acting for city and county when the plaintiff's deed was filed for record was *de jure*, the proper officer for that purpose, as to lands lying within the territory which was afterwards organized as the separate county of St. Louis.

Some questions are here discussed, arising out of the bankruptcy of Ringrose J. Watson in 1877. The conclusion herein reached, as to the effect which ought to be given to the recording of the plaintiff's deed from Watson, eliminate them from the controversy, and there is no need for us to consider them. The same is true of the questions concerning the sufficiency of the judgment and transcript proceedings under which the defendant claims. The defendant's admission of the common source of title, and of his possession of the premises at the time laid in the petition, preclude all further controversy about the plain-

tiff's right of recovery. The value of the rents and profits is admitted, at $6 per annum. The judgment is reversed and the cause remanded, with directions to the circuit court to enter a judgment for possession in favor of the plaintiff, with an assessment of his damages computed at $6 per annum from the first day of February, 1883, to the date of the judgment, and for prospective value of monthly rents at the same rate. All the judges concur.